**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LIONEL LOURAWLS WOODS,    )  NO. CV 12-8300 JFW (AS)
                    )
         Petitioner,  )
                    )
        v.          )  **FINAL REPORT AND RECOMMENDATION OF**
                    )
RON BARNES,          )  **A UNITED STATES MAGISTRATE JUDGE**
                    )
         Respondent.  )
_____)

    This Final Report and Recommendation is submitted to the Honorable John F. Walter, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

**I.**

**INTRODUCTION**

    On September 26, 2012, Lionel Lowrawls Woods ("Petitioner"), a California state prisoner proceeding through counsel, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. (Dkt. No. 1). On October 3, 2012, Petitioner filed a request to stay

the Petition and hold it in abeyance pending exhaustion of issues in state court, which United States Magistrate Judge Paul L. Abrams granted on October 5, 2012.[1] (Dkt. Nos. 4, 7). Thereafter, on September 1, 2014, Petitioner filed a First Amended Petition ("FAP") as well as an accompanying memorandum of points and authorities ("FAP Mem."). (Dkt. Nos. 45-46). The FAP raised eight grounds for habeas corpus relief. (Id.).

On March 17, 2015, Respondent filed a Motion to Dismiss the FAP, contending that Grounds Six and Seven, and the portion of Ground Eight addressing Grounds Six and Seven, were untimely. (Dkt. No. 60). On October 27, 2015, the Court issued a Report and Recommendation recommending that the Motion to Dismiss be granted. (Dkt. No. 77). On June 2, 2016, the undersigned approved the parties' stipulation to voluntarily dismiss with prejudice Grounds Six, Seven and the portion of Ground Eight addressing Grounds Six and Seven, denied Respondent's Motion to Dismiss as moot, and withdrew the Report and Recommendation. (Dkt. Nos. 82-83).

On December 2, 2016, Respondent filed an Answer with an accompanying memorandum of points and authorities ("Ans. Mem."). (Dkt. No. 94). Petitioner filed a Reply with an accompanying memorandum of points and authorities on May 3, 2017, and a corrected memorandum of points and authorities ("Reply Mem.") on May 4, 2017. (Dkt. Nos. 108-09, 112).

---

[1] On August 21, 2013, the matter was reassigned to the undersigned Magistrate Judge. (Docket Nos. 23-24).

On August 28, 2017, the undersigned issued a Report and Recommendation. (Dkt. No. 114). On October 11, 2017, Petitioner, through counsel, filed Objections to the Report and Recommendation. (Dkt. No. 124). The Court now issues this Final Report and Recommendation to address Petitioner's Objections.

For the reasons discussed below, it is recommended that the Petition be DENIED and that this action be DISMISSED with prejudice.

## II.

### PRIOR PROCEEDINGS

On June 4, 2008, a San Luis Obispo County Superior Court jury found Petitioner guilty of one count of conspiracy to commit robbery in violation of California Penal Code ("P.C.") § 182(a)(1) (count 5), and found true the allegation that Petitioner committed the crime for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members within the meaning of P.C. § 186.22(b)(1). (Clerk's Transcript ("CT") 1984-85, 1997; Reporter's Transcript ("RT") 11152-55).[2] The trial court subsequently found true the allegations that Petitioner had previously been convicted of two

---

[2]    Petitioner was tried with co-defendants Leonard Augustard Jones, Demorial Davon Lovely, Rodney Dante Mitchell, Shawn LRoy Quinney, and Ronald F. Simpson, each of whom were convicted of the same crime as Petitioner and sentenced to terms ranging from 8 years in state prison (Quinney) to 40-years-to-life in state prison (Mitchell). (Lodgment 1 at 1-2 & n.2). "Jones was also charged with four counts of robbery that were unrelated to the conspiracy. The jury deadlocked on those counts (counts 1 through 4)." (Id. at 3).

3

serious violent felonies within the meaning of California's Three Strikes law, P.C. §§ 667(b)-(i) & 1170.12(a)-(d), and one serious felony within the meaning of P.C. § 667(a). (CT 1998; 11172-75). On January 15, 2009, the trial court sentenced Petitioner to 35-years-to-life in state prison. (CT 3413, 3415-16; RT 16243-44).

Petitioner appealed his conviction and sentence to the California Court of Appeal, which on March 14, 2011, modified Petitioner's judgment to reflect a $20 court security fee and affirmed the judgment as modified. (Lodgments 1, 16-18). Petitioner then filed a petition for review in the California Supreme Court, which summarily denied the petition on June 29, 2011. (Lodgments 2-3).

On October 4, 2012, Petitioner filed a habeas corpus petition in the California Supreme Court, which denied the petition on December 12, 2012, with citation to In re Waltreus, 62 Cal. 2d 218, 225 (1965) and In re Lindley, 29 Cal. 2d 709, 723 (1947). (Lodgments 4-5). On December 5, 2012, Petitioner filed a habeas corpus petition in the San Luis Obispo County Superior Court, which denied the petition on December 18, 2012. (Lodgments 6-7). On February 5, 2013, Petitioner filed a habeas corpus petition in the California Court of Appeal, which denied the petition on March 27, 2013 with citation to People v. Duvall, 9 Cal. 4th 464, 474 (1995). (Lodgments 8-9). On April 8, 2013, Petitioner filed a second habeas corpus petition in the California Court of Appeal, which was summarily denied on June 17, 2013. (Lodgments 10-11). On July 24, 2013, Petitioner filed a second habeas corpus petition in the California Supreme Court, which denied

the petition on November 13, 2013 with citation to <u>In re Clark</u>, 5 Cal.
4th 750, 767-69 (1993). (Lodgments 12-13).

### III.

### FACTUAL BACKGROUND

The following facts, taken from the California Court of Appeal's
decision on direct review, have not been rebutted with clear and
convincing evidence and must be presumed correct. 28 U.S.C.
§ 2254(e)(1); <u>Slovik v. Yates</u>, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

*Counts 1-4: Jones – Downey Savings Robbery*

On November 21, 2007, an African-American woman attempted
to open an account at Downey Savings in San Luis Obispo. The
woman had no identification and left. Seconds later, two
African-American men wearing masks entered the bank, took about
$11,000 from the cashiers and $160 from a customer. One of the
robbers brandished a pellet gun.

. . . Leonard Jones rendezvoused with the bank robbers and
the woman at Karl Jones' (Karl)[fn. 3] house a few minutes after
the robbery. The group divided the money and left.

[Fn. 3] Karl Jones in not related to . . . Leonard
Jones. . . .

5

Karl, a police informant, told the police that his house was used by Leonard Jones to stage the robbery. Karl met with a FBI agent and turned over the pellet gun that was loaned to Jones for the robbery. Karl identified photos of Jones and of one of the bank robbers, Dejuan Javier,[fn. 4] and said that the second robber looked like Ean Domingo's photo.

[Fn. 4] Dejuan Javier was convicted of four counts of robbery with street gang enhancements in a separate proceeding [that was affirmed on appeal]

*Count 5: December 13, 2007 Conspiracy to Rob Los Padres Bank*

The FBI placed a tracking device on Jones' Nissan and monitored his movements to Los Angeles and back to San Luis Obispo. On December 12, 2007, officers observed Jones go to Laguna Plaza near Karl's house.

Jones returned to the house and stated that he was robbing a bank the next day. Jones showed Karl the escape route and asked Karl to assist in the getaway. Jones planned to commit a lot more crimes in San Luis Obispo because it was a "Mayberry RFD type town, very slow."

Karl warned the police about the planned bank robbery. Earlier that day, Jones checked into the Rose Garden Inn, located a short distance from Laguna Plaza.

At 6:50 a.m. on December 13, 2007, Mitchell, Quinney, Lovely, Simpson, [Petitioner], and a sixth man, Paul Goins, drove up to Jones' hotel in three vehicles. The group parked next to Jones' car and spoke to Jones. Jones led everyone to Karl's house and to Laguna Plaza where the Los Padres Bank was located.

Returning to Karl's house, the group prepared for the robbery and discussed how they would share the robbery proceeds. A police surveillance team monitored the conversations through a listening device that Karl was carrying.[fn. 5]

[Fn. 5] Detective Allison Martinez of the San Luis Obispo Police Department, testified that she listened to . . . Jones telling his coconspirators to leave their cell phones at Karl's house. She also heard a conversation concerning a "cooler or water bucket." In addition to Detective Martinez, Goins testified that he was present when the conspirators discussed how the money would be divided.

A few minutes after the Los Padres Bank opened, [Petitioner and his co-defendants] were arrested leaving the house in three vehicles. Mitchell was driving a Mercury sedan with Quinney and Simpson seated in the vehicle wearing hooded sweatshirts. Inside the Mercury, officers found two pairs of gloves, pillow cases, a disposable respirator mask, and a bucket of water.

FBI Special Agent Douglas Oliver testified that bank robbers use water containers to submerge stolen bank money bundled with dye packs. The water prevents the dye packs from exploding and damaging the money. Special Agent Oliver stated that it was common for bank robbers to use chase cars to divert the police and do a "dry run" before committing a robbery.

*Goins' Testimony*

Paul Goins entered a plea to attempted robbery and testified for the prosecution. Goins' testimony and statements to the police established the following: [¶] Goins lived in Los Angeles and was [Petitioner's] brother. On the evening of December 12, 2007, [Petitioner] called and asked Goins to participate in a bank robbery. [Petitioner] also wanted to talk to Lovely, Goins' cousin.

Lovely called late that night and asked Goins to pick him up. Goins and Lovely drove to a service station where Mitchell was waiting. After Mitchell picked up Quinney and Simpson in Inglewood, they joined [Petitioner].

The group drove north through the night, meeting Jones in San Luis Obispo early the next morning. Jones and [Petitioner] were long time friends.

Jones took the group to Karl's house and to Laguna Plaza where they cased the Los Padres Bank. Mitchell was to drop

8

"the two youngsters" (Quinney and Simpson) off and pick them up after they robbed the bank. Goins' job was to drive one of the robbers back to Los Angeles.

After casing the bank, the group returned to Karl's house, got ready for the robbery, and discussed how they would share the robbery proceeds. Jones and [Petitioner] led the discussion. [Petitioner] said that Goins would not receive a share of the robbery money but would be paid $200 and gas money.

Jones gave Quinney and Simpson pillow cases to carry the money and asked for a bucket of water which was put in the Mercury. Mitchell, Simpson, and Quinney were told to leave their cell phones on Karl's couch.

Mitchell put on a blue shirt and tie before leaving the house. Quinney and Simpson were wearing gloves and hooded sweatshirts.

The group left Karl's house in three vehicles. Mitchell, Quinney, and Simpson were in the Mercury sedan. Jones and [Petitioner] were in the Nissan. Goins and Lovely followed in Goins' Hyundai.

The police stopped all three vehicles a few minutes after 9:00 a.m. Officers found a backpack with Mitchell's clothing, wallet and two cell phones in Karl's house. A driver's license

9

bearing Simpson's name was in Goins' Hyundai, stuffed in a shoe.

Goins told the police that they drove to San Luis Obispo "to do a lick," i.e., commit a robbery. Goins was waiting for [Petitioner and his co-defendants] to do "the job" so he could drive one of the robbers back to Los Angeles.

*Gang Evidence*

[Petitioner and his co-defendants] belonged to four Los Angeles Crip gangs. Jones (aka Peter Fresh) was an Original Valley Gangster Crip (OVG). Lovely, Mitchell, and Simpson belonged to the Rolling 40's Neighborhood Crip gang (Rolling 40's). [Petitioner] and one of the men involved in the Downey Savings robbery (DeJuan Javier) were active members of the Eight-Trey Gangster Crip gang (Eight-Trey). Quinney was an active member of the Five-Five Neighborhood Crip gang (Five-Five).

Los Angeles Police Officers Richard Mendoza, Louis Marin, and Bradley Nielson testified as expert witnesses and worked in South Central Los Angeles where the OVG, the Rolling 40's, the Five-Five, and the Eight-Trey gangs were prominent. The officers stated that the gangs were criminal street gangs and the primary activities of the gangs included drug sales, bank robberies, drive-by and walk-up shootings, violent assaults, and witness intimidation. The gangs placed a high value on

respect, gained respect by committing crimes, and sometimes worked together to commit gang related crimes.

Officer Mendoza stated that Jones (age 43) was an OVG Gangster Crip and that it was not uncommon for older gang members to commit sophisticated crimes such as bank robberies with younger gang members.[3]  In response to a hypothetical based on the December 13 conspiracy, Officer Mendoza opined that the crime was committed in association with and to benefit the gangs.  The bank robbery, if accomplished, would benefit the gangs by providing money to purchase weapons and drugs and would facilitate future crimes.  Even if the robbery failed, the bold attempt to rob a bank 200 miles from Los Angeles would enhance the reputation of the gangs and make it easier to recruit new gang members.

Officer Nielsen stated that members of different Crip gangs, both young and old, were known to collaborate in bank robberies.  In response to the hypothetical based on the December 13 conspiracy, Officer Nielsen opined that the crime was committed in association with and to benefit the gangs. Officer Nielsen stated that it would "benefit everybody from the person who organizes it, whoever that is, whatever gang or whatever [Crip] set they are from, all the way down to . . . the foot soldier who's carrying out the acts."

---

[3]  Officer Mendoza also opined that Petitioner was an active member of the Eight-Trey Gangster Crips.  (RT 7264-65).

11

Officer Marin was familiar with the Rolling 40's gang and testified that Mitchell, Lovely, and Simpson were active members of the gang. When asked the same hypothetical about the December 13 conspiracy, Officer Marin opined that the crime was committed for the benefit of and in association with the gangs. Officer Marin opined that the conspiracy was committed with the specific intent to promote, further, or assist criminal conduct by gang members.

(Lodgment 1 at 3-7 (footnote added)).

## IV.

## PETITIONER'S CLAIMS

Petitioner raises the following claims for federal habeas relief:

Ground One:    Failure to bifurcate the criminal street gang enhancement violated Petitioner's Fourteenth Amendment right to due process of law and a fair trial by allowing the "erroneous admission of . . . evidence . . . so serious as to violate [Petitioner's] federal constitutional right[] to due process[.]"

Ground Two:    Petitioner was denied due process of law and a fair trial when Karl Jones testified falsely at trial.[4]

_____

[4]    To avoid confusion, the Court – in accordance with the California Court of Appeal's Opinion – refers to Karl Jones by his first name. (See Lodgment 1 at 3 n.3). Any reference to "Jones"

12

Ground Three: The prosecution failed to disclose favorable evidence that impeached Paul Goins's credibility in violation of Petitioner's Fourteenth Amendment right to due process of law and a fair trial.

Ground Four: The eight uniformed officers and two armed deputies in the courtroom depicted Petitioner as an untrustworthy, dangerous criminal in violation of Petitioner's Fourteenth Amendment rights.

Ground Five: The unjustified initial stun belt orders and restraint with shackles were reversible errors that prejudicially violated Petitioner's Fourteenth Amendment right to due process of law and a fair trial.

Ground Eight: Petitioner's constitutional rights were violated by cumulative error.[5]

(FAP at 5-6; FAP Mem. at 5-39, 46).

\\
\\
\\
\\
\\

_____

refers to co-defendant Leonard Jones.

[5] As discussed above, Petitioner voluntarily dismissed with prejudice Grounds Six and Seven and the portion of Ground Eight related to Grounds Six and Seven. (Dkt. Nos. 82-83).

13

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 562 U.S. 86, 98 (2011). Under AEDPA's deferential standard, a federal court may grant habeas relief only if the state court adjudication was contrary to or an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts. 28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

Petitioner raised Grounds One through Five and the remaining portion of Ground Eight in his petition for review to the California Supreme Court, which denied the petition without comment or citation to authority. (Lodgments 2-3). The Court "looks through" the California Supreme Court's silent denial to the last reasoned decision as the basis for the state court's judgment. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Cannedy v. Adams, 706 F.3d 1148, 1159 (9th Cir. 2013) ("[W]e conclude that *Richter* does not change our practice of 'looking through' summary denials to the last reasoned decision – whether those denials are on

the merits or denials of discretionary review." (footnote omitted)),
<u>as amended</u>, 733 F.3d 794 (9th Cir. 2013). Therefore, the Court will
consider the California Court of Appeal's reasoned opinion addressing
Petitioner's claims.[6] <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 380 (2010).

**VI.**

**DISCUSSION**

## A. <u>Failure to Bifurcate Trial/Inadmissible Evidence</u>

In Ground One, Petitioner contends he was denied due process of law
when the trial court failed to bifurcate the criminal street gang
enhancement from the underlying charges against him, which allowed the
erroneous admission of prejudicial gang evidence. (FAP at 5; FAP Mem.
at 4-21).

\\

\\

\\

---

[6] However, the California Court of Appeal did not specifically
address the portion of Ground Five relating to the trial court's
initial stun belt order. Nevertheless, the Court presumes the
California Court of Appeal denied the stun belt portion of Ground Five
on the merits, <u>see</u> <u>Johnson v. Williams</u>, 133 S. Ct. 1088, 1096 (2013)
("When a state court rejects a federal claim without expressly
addressing that claim, a federal habeas court must presume that the
federal claim was adjudicated on the merits - but that presumption can
in some limited circumstances be rebutted."), and Petitioner has not
rebutted this presumption. Accordingly, the Court must conduct "an
independent review of the record" to determine whether the decision to
deny the stun belt portion of Ground Five was contrary to, or an
unreasonable application of, clearly established federal law. <u>Murray
v. Schriro</u>, 745 F.3d 984, 996-97 (9th Cir. 2014); <u>Walker v. Martel</u>, 709
F.3d 925, 939 (9th Cir. 2013).

15

### 1.  Background

Before trial, Petitioner joined in co-defendant Jones's motion to bifurcate the gang enhancement from the underlying offenses, and the prosecution opposed the motion.  (CT 1272-76, 1288-94, 1357-58).  On April 3, 2008, the trial court held a hearing and denied the bifurcation motion.  (RT 622-41).

### 2.  California Court of Appeal's Opinion

The California Court of Appeal rejected Petitioner's claim, stating:

> Bifurcation would have prejudiced the prosecution's theory of the case and the ability to voir dire jurors about gang beliefs and biases.  [Petitioner and his co-defendants] told the trial court that if bifurcation was to be granted, they were willing to take a "gamble" on voir dire.  But [Petitioner and his co-defendants] had no due process right to select a jury that was biased or unwilling to decide the case based on evidence.  Bifurcation of the gang enhancement would have made it a "heads I win, tails you lose" trial.  The trial court had a duty to see that an impartial jury was selected and that both sides received a fair trial.
>
> Also, bifurcation would have prejudiced the prosecution's ability to explain Karl's and Goins' demeanor and to rebut the defense claim that they were lying.  Goins was scared at the

preliminary hearing and trial, feared reprisals, and had to find a new place to live. Karl, the police informant, feared for his safety and moved out of state for safety and protection. Evidence of gang intimidation and retaliation against those who cooperate with the police was relevant to the issue of witness credibility. [C]ommitting a crime with gang members bolsters cooperation and enhances the fear and intimidation element so that no one "rats" on another. It is part of a gang's "internal code" to ensure that no one cooperates with the police.

Karl and Goins knew about the code of silence and the repercussions that would follow if they "ratted" on [Petitioner and his co-defendants]. "Gang members tend to protect and avenge their associates." Bifurcation of the gang enhancement would have precluded the jury from considering why Karl and Goins were reluctant to testify, why they gave inconsistent statements to the police, and why they feared retaliation.

[Petitioner and his co-defendants] argue that bifurcation would have prevented the infusion of inflammatory gang evidence at trial. But gang affiliation and activity was woven into the factual fabric of the case. The gang evidence showed how the gangs evolved, why [Petitioner and his co-defendants] as fierce rivals collaborated to commit the bank robbery, why the robbery benefitted the gangs, and why the money was to be shared between gang members but not with Goins.

17

1      [T]he trial court found that the gang evidence was
2   admissible to prove the robbery conspiracy.  It did not err.
3   "[C]ommon gang membership may be part of circumstantial
4   evidence supporting the inference of a conspiracy."  Because
5   the gang evidence was cross-admissible, "[t]here was no need
6   for, and in fact, no reasonable way to bifurcate the [gang]
7   enhancement allegation."  Evidence of gang membership, as well
8   as evidence of each gang's territory, beliefs and practices,
9   criminal enterprises, and rivalries was properly admitted to
10  prove identity, motive, modus operandi, and specific intent.
11
12      Since there was no abuse of discretion under state law,
13  [Petitioner and his co-defendants'] derivative claims of
14  constitutional error fail.  The jury deadlocked on the robbery
15  counts (counts 1-4) which strongly suggests that it was not
16  prejudiced by the gang evidence and applied the law in an
17  unbiased fashion.  [Petitioner and his co-defendants] make no
18  showing that the gang evidence was "so extraordinarily
19  prejudicial, and of so little relevance to guilt, that it
20  threaten[ed] to sway the jury to convict regardless of [their]
21  actual guilt."  Nor were [Petitioner and his co-defendants]
22  denied any due process right to a fair trial.
23
24  (Lodgment 1 at 12-14 (citations omitted)).
25  \\
26  \\
27  \\
28  \\

1   **3. Analysis**

2

3           a.   State Law Claims

4

5       Petitioner relies on state law throughout Ground One.   (See FAP

6   Mem. at 8-19).   For instance, Petitioner asserts that in denying the

7   bifurcation request, the trial court "abused its discretion and

8   [improperly] refused to conduct [a Cal. Evid. Code §] 352 weighing of

9   undue prejudice."[7]   (FAP Mem. at 8-9).   However, a federal court, in

10  conducting habeas review, is limited to deciding whether a state court

11  decision violates the Constitution, laws or treaties of the United

12  States.   28 U.S.C. § 2254(a); Swarthout v. Cooke, 562 U.S. 216, 219

13  (2011) (per curiam); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

14  Federal habeas corpus relief "does not lie for errors of state law[,]"

15  Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Wilson v.

16  Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only

17  noncompliance with *federal* law that renders a State's criminal judgment

18  susceptible to collateral attack in the federal courts." (emphasis in

19  original)), and Petitioner "may not transform a state-law issue into a

20  federal one merely by asserting a violation of due process." Langford

21  v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997).   Accordingly, to the

22  extent Petitioner claims – in Ground One or in any of his other grounds

23  for relief – that he is entitled to habeas corpus relief due to an

24  alleged state law violation or because the trial court abused its

25

26          [7]   Cal. Evid. Code § 352 provides that "The court in its discretion
    may exclude evidence if its probative value is substantially outweighed
27  by the probability that its admission will (a) necessitate undue
    consumption of time or (b) create substantial danger of undue
28  prejudice, of confusing the issues, or of misleading the jury."

                                    19

discretion, such claim is not cognizable in this proceeding and will not be further addressed. See Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) (violation of California law regarding consolidation of claims is not cognizable in federal court); Williams v. Borg, 139 F.3d 737, 740 (9th Cir. 1998) (Federal habeas relief is available "only for constitutional violation, not for abuse of discretion.").

b. Clearly Established Federal Law

Under Section 2254(d)(1), "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Knowles v. Mirzayance, 556 U.S. 111, 121 (2009) (quoting 28 U.S.C. § 2254(d)(1)). "Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (citation omitted); White v. Woodall, 134 S. Ct. 1697, 1702 (2014). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 71-72; Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004). "If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law." Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir.

20

2004).

Petitioner complains he was denied due process of law when the trial court failed to bifurcate the criminal street gang enhancement from the underlying charges against him and then erroneously allowed gang experts to introduce prejudicial evidence about, inter alia, numerous predicate acts committed by gang members. However, the Supreme Court has concluded there is no constitutional right to a bifurcated criminal trial.[8]  See Spencer v. Texas, 385 U.S. 554, 568

---

[8]  In his Reply, Petitioner cites United States v. Lane, 474 U.S. 438, 446 n.8 (1986) for the proposition that "[m]isjoinder violates the Constitution where it results in prejudice so great as to deny a defendant his right to a fair trial." (Reply Mem. at 2). However, "the statement in Lane regarding when misjoinder rises to the level of constitutional violation was dicta[.]" Runningeagle v. Ryan, 686 F.3d 758, 776-77 (9th Cir. 2012); Collins v. Runnels, 603 F.3d 1127, 1132 (9th Cir. 2012). Therefore, Lane is not "'clearly established Federal law' sufficient to support a habeas challenge under § 2254." Runningeagle, 686 F.3d at 777; Collins, 603 F.3d at 1132-33.

In his Objections, Petitioner for the first time cites Zafiro v. United States, 506 U.S. 534 (1993). (Objections at 4). In particular, Petitioner cites language in Zafiro stating that "a district court should grant a severance under [Fed. R. Crim. P.] 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. But this citation does not alter the Court's analysis. Zafiro "is not binding on the state courts because it addresses the Federal Rules of Criminal Procedure" and, like the dicta in Lane, it does not constitute clearly established federal law under § 2254. Runningeagle, 686 F.3d at 776-77; Collins, 603 F.3d at 1131-33. Nor does citing appellate court cases applying pre-AEDPA law and an unpublished district court case further Petitioner's argument. (See Objections at 3-6; see also Glebe v. Frost, 135 S. Ct. 429, 431 (2014) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"); Murray, 745 F.3d at 997 ("Our precedent cannot be mistaken for clearly established Supreme Court law." (emphasis in original)).

(1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); Jensen v. Hernandez, 572 F. App'x 540, 541 (9th Cir. 2014) ("[T]he failure to bifurcate the proceedings was not a constitutional violation in and of itself."); Sanchez v. Martel, 2015 WL 7306700, *10 (C.D. Cal.) ("[T]he Supreme Court has consistently maintained that a criminal defendant has no due process right to a bifurcated trial."), report and recommendation adopted by, 2015 WL 11234035 (C.D. Cal. 2015); Johnson v. McDonald, 2015 WL 2453429, *9 (C.D. Cal.) ("The Supreme Court has never held that a refusal to bifurcate the trial of a gang sentencing enhancement allegation implicates a defendant's federal due process rights."), report and recommendation accepted by, 2015 WL 2453431 (C.D. Cal. 2015). Moreover, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting 28 U.S.C. § 2254(d)); Zapien v. Martel, 849 F.3d 787, 794 (9th Cir. 2016), pet. for cert. filed, (May 13, 2017). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process" and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F.3d at 1101; Zapien, 849 F.3d at 794.

In the absence of Supreme Court precedent, Petitioner is not entitled to habeas corpus relief on Ground One because the state

22

court's rejection of this claim cannot be contrary to, or an unreasonable application of, clearly established federal law.  See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.  Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." (citation and internal quotation marks omitted; brackets in original)); Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court. . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (citation omitted)); Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law.").[9]

\\

\\

\\

\\

\\

---

[9]    Having reached this conclusion, it is unnecessary to address Respondent's other arguments, including his assertion that Teague v. Lane, 489 U.S. 288 (1989), bars Ground One.  (Ans. Mem. at 9-11); see also Sauls v. Valenzuela, 2014 WL 3870491, *16 n.8 (C.D. Cal.) ("'Here, it is not necessary to resolve the Teague issue because Petitioner's claim is foreclosed by AEDPA. . . .  Therefore, the issue the Court addresses first is not whether Petitioner's claim is barred by Teague's doctrine of non-retroactivity, but whether Petitioner has stated a violation of "clearly established federal law" under AEDPA.'" (quoting Adams v. Hedgpeth, 2012 WL 4069351, *5 (C.D. Cal.), report and recommendation accepted by, 2012 WL 4087225 (C.D. Cal. 2012)), report and recommendation accepted by, 2014 WL 3888146 (C.D. Cal. 2014).

## B.  **Prosecutorial Misconduct**

In Ground Two, Petitioner contends he was denied due process of law when prosecution witness Karl Jones testified falsely at trial.[10]  (FAP at 5; FAP Mem. at 21-24).  In Ground Three, Petitioner contends the prosecution failed to disclose favorable evidence that impeached Paul Goins's credibility in violation of Petitioner's Fourteenth Amendment right to due process of law and a fair trial.[11]  (FAP at 6; FAP Mem. at 24-29).

---

[10]  Petitioner frames Ground Two within the context of the trial court's denial of his new trial motion, which Petitioner claims allowed the perjured testimony to stand.  (FAP at 5; FAP Mem. at 21-24).  But a "motion for new trial in a criminal case is a [California] statutory right[,]" People v. Dillard, 168 Cal. App. 2d 158, 167 (1959), and the denial of a motion for new trial does not state a cognizable claim in this proceeding.  See Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."); Chaidez v. McDonald, 2015 WL 575849, *23 (C.D. Cal. 2015) ("Petitioner's challenge to the trial court's denial of his motion for a new trial presents a state law issue which is not cognizable in a federal habeas proceeding.").  Therefore, the issue properly before this Court is not the trial court's denial of Petitioner's new trial motion, but rather the claim underlying that motion – the purported due process violation that occurred due to Karl Jones's alleged perjured testimony.  Having so concluded, the Court need not address Respondent's arguments directed toward the new trial aspect of Ground Two.  (See Ans. Mem. at 18-24).

[11]  Respondent contends Grounds Two and Three are procedurally defaulted.  (Ans. Mem. at 25-27, 31).  However, the Court will not address this argument since it retains the discretion to deny claims on the merits even if the claims are alleged to be procedurally defaulted. See Flournoy v. Small, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012) ("While we ordinarily resolve the issue of procedural bar prior to any consideration of the merits on habeas review, we are not required to do so when a petition clearly fails on the merits."); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[C]ourts are empowered to, and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar.").

24

**1. Background**

The California Court of Appeal set forth the following facts underlying Ground Two:

> [Petitioner] and Simpson [each filed a Motion for a New Trial pursuant to P.C. § 1181(8)] "based on newly discovered evidence that Karl misidentified one of the Downey Savings robbers. Karl told the police that the robbery was committed by Jones and two men that he barely knew. Karl identified DeJuan Javier as one of the robbers and said that Ean Domingo's photo looked like the second robber.
>
> After [Petitioner and his co-defendants] were convicted of conspiracy, Domingo was arrested and charged with robbing the Downey Savings bank. On July 18, 2008, the prosecution dismissed the robbery charges against Domingo based on DNA evidence excluding him as the robber. It was later determined that the pellet gun used in the robbery had DNA traces consistent with Michael Smith's DNA profile.

(Lodgment 1 at 17-18 (citation omitted); see also CT 2571-78, 2612-2738, 2907-11, 2965-73, 3165-73, 3177-3294, 3314-20, 3338-48; RT 4540-46, 4565, 13203-18, 16204-19).

> [Petitioner also] filed a supplemental motion for new trial based on a statement from Stacy Henderson, Karl's neighbor. Henderson did not recall giving Karl the pellet gun,

25

as Karl testified at trial. Henderson's mother, however, told
the police that Henderson was a drug addict and a mental health
patient. It was consistent with Karl's statement that he
acquired the pellet gun from Henderson in exchange for drugs.

(Lodgment 1 at 19 n.8).

The California Court of Appeal set forth the facts underlying
Ground Three, as follows:

During the trial, Lovely asked the prosecution about phone
calls that Goins made from jail. Lovely did not know whether
the phone calls were recorded or exculpatory, but requested
copies of audiotapes if they existed. The prosecutor stated
that he was not aware of any recorded phone calls or
exculpatory statements.

(Lodgment 1 at 20; <u>see</u> <u>also</u> RT 7078-79).

**2.    California Court of Appeal's Opinion**

The California Court of Appeal rejected Petitioner's false
testimony claim, stating:

The true identity of the Downey Savings robber was
discovered a month after [Petitioner and his co-defendants]
were convicted. It was a surprise to everyone, including the
police and Karl who admitted that 'I picked out the wrong guy.'

26

[Petitioner] makes no showing that Karl's testimony or the use of Karl as a prosecution witness denied [he and his co-defendants] a fair trial.

(Lodgment 1 at 19-20).  The California Court of Appeal also rejected Ground Three:

[Petitioner's] due process argument is based on the theory that audiotapes might have existed and may have contained exculpatory evidence.  But absent a showing the prosecution withheld favorable and material evidence, there is no due process violation.  "[S]uppression by the Government is a necessary element of a *Brady* claim."  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."

[Petitioner] argues that the prosecution may have inadvertently suppressed exculpatory evidence, but speculation is not enough.  "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."

The record is silent on whether phone audiotapes were made or ever existed.  What we do know is that [Petitioner] had enough information to subpoena jail records and personnel to determine if Goins' phone calls were monitored or recorded.

27

Having failed to do so, [Petitioner] is precluded from arguing
that the prosecution should have made further inquiries.

(Lodgment 1 at 20-21 (citations omitted)).

### 3. Analysis

#### a. False Testimony

A "conviction obtained by the [prosecutor's] knowing use of
perjured testimony is fundamentally unfair, and must be set aside if
there is any reasonable likelihood that the false testimony could have
affected the judgment of the jury." United States v. Agurs, 427 U.S.
97, 103 (1976) (footnotes omitted); see also Giglio v. United States,
405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and jurors
by the presentation of known false evidence is incompatible with
'rudimentary demands of justice.'"); Miller v. Pate, 386 U.S. 1, 7
(1967) ("[T]he Fourteenth Amendment cannot tolerate a state criminal
conviction obtained by the knowing use of false evidence."); Napue v.
Illinois, 360 U.S. 264, 269 (1959) ("[I]t is established that a
conviction obtained through use of false evidence, known to be such by
representatives of the State, must fall under the Fourteenth
Amendment[.]"). Moreover, "[a] prosecutor . . . has a constitutional
duty to correct evidence he or she knows is false, even if it was not
intentionally submitted." Mancuso v. Olivarez, 292 F.3d 939, 957 (9th
Cir. 2002), overruled on other grounds as recognized by, United States
v. Chandler, 658 F. App'x 841 (2016); Napue, 360 U.S. at 269; Hayes v.
Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). "To prevail on a

28

[false evidence] claim, 'the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony [or evidence] was actually false, and (3) that the false testimony [or evidence] was material.'" <u>Hein v. Sullivan</u>, 601 F.3d 897, 908 (9th Cir. 2010); <u>Napue</u>, 360 U.S. at 269.

Petitioner contends that a due process violation occurred when the prosecutor presented Karl Jones's testimony incorrectly identifying Ean Domingo as one of the Downey Savings robbers. (FAP Mem. at 21). However, Petitioner cannot establish a due process violation. First, while Petitioner claims Karl provided "perjured testimony" (FAP Mem. at 21), the California Court of Appeal found otherwise, stating that when "[t]he true identity of the Downey Savings robber was discovered a month after [Petitioner and his co-defendants] were convicted[,]" it "was a surprise to everyone, including the police and Karl[.]"[12] (Lodgment 1 at 20). "Findings of fact in the last reasoned state court

---

[12] At a hearing following Petitioner's conviction, the prosecutor explained that after an anonymous phone call stating "'You have the wrong [person] in custody[,]'" it was discovered that Ean Domingo was not involved in the Downey Savings robbery after analysis of DNA found on the pellet gun was linked to another person, Michael Smith. (RT 14704-06). The prosecutor told the trial court that thereafter:

> Chief investigator Bill Handley found Karl Jones. And unbeknownst to Karl Jones knowing we had the DNA hit, provided . . . six-pack photos to Karl Jones. When Karl Jones was shown the photo of Ean Domingo, it was not in a six-pack, it was one photo and Karl Jones identified that person as [involved in the robbery]. When the six-pack was shown to [Karl] Jones, Karl Jones said, "I made a mistake." He immediately picked out . . . Michael Smith. And Karl Jones didn't know of the DNA hit and still to this day doesn't know of the DNA hit.

(RT 14705-06).

decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence."[13] <u>Hedlund v. Ryan</u>, 854 F.3d 557, 563 (9th Cir. 2017). Here, Petitioner has not rebutted the California Court of Appeal's implicit conclusion that Karl's incorrect identification of Domingo was an honest mistake rather than a deliberate falsehood. <u>See</u> <u>United States v. Renzi</u>, 769 F.3d 731, 752 (9th Cir. 2014) ("Mere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood requirement."), <u>cert.</u> <u>denied</u>, 135 S. Ct. 2889 (2015); <u>Henry v. Ryan</u>, 720 F.3d 1073, 1084 (9th Cir. 2013) ("Although Henry has provided evidence rebutting Patterson's version of the facts, he has provided no evidence that Patterson *knew* his testimony was inaccurate at the time he presented it, rather than Patterson's recollection merely being mistaken, inaccurate or rebuttable." (italics in original)); <u>United States v. Pelisamen</u>, 641 F.3d 399, 407-08 (9th Cir. 2011) (denying false testimony claim when "[t]he district court's implicit conclusion that Bellas did not intentionally perjure himself [was] . . . well supported.").

Moreover, Petitioner has not shown that the prosecutor knew, or should have known, that Karl's testimony was false. <u>See</u> <u>Gonzalez v. Wong</u>, 667 F.3d 965, 994 (9th Cir. 2011) ("[C]onjecture and coincidence cannot win the day, particularly given the deference due the state

---

[13] This is true for both explicit and implicit factual findings. <u>See</u> <u>Tinsley v. Borg</u>, 895 F.2d 520, 525-26 (9th Cir. 1990) (implicit factual findings are entitled to a presumption of correctness); <u>Taylor v. Horn</u>, 504 F.3d 416, 433 (3d Cir. 2007) ("Implicit factual findings are presumed correct under § 2254(e)(1) to the same extent as express factual findings.").

court's conclusions. Absent . . . evidence [that the prosecutor knowingly allowed the witness to lie during his testimony], there is no reason to question the [state court's] conclusion that the claim is meritless."); <u>Pelisamen</u>, 641 F.3d at 408 ("Nothing in the record supports an inference that the government knew that [the witness's] testimony about how the money transfer was made was 'false.'"); <u>Hayes v. Ayers</u>, 632 F.3d 500, 521 (9th Cir. 2011) ("The government could not, and was not required to, correct a supposed misstatement that it did not know was false."); <u>Morales v. Woodford</u>, 388 F.3d 1159, 1179 (2004) ("The essence of the due process violation is misconduct by the government, not merely perjury by a witness. Morales, however, sets out no factual basis for attributing any misconduct, any knowing presentation of perjury, by the government. Thus there is no basis for granting the writ even if [the witness] did lie." (footnote omitted)); <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 959 (9th Cir. 2001) (denying due process claim when even assuming testimony was false, "Murtishaw presents no evidence that the prosecution knew it was false").[14]

---

[14] In denying Petitioner's new trial motion, the California Court of Appeal also convincingly explained why the testimony in question was not material:

> Here, the new evidence was limited to the Downey Savings robbery and went to Karl's credibility which was thoroughly impeached at trial. Other than Karl, no witness linked Jones to the robbery. On cross-examination, Karl admitted that he was unemployed, that he was a paid police informant, that he had prior convictions, that he had been involved in drug sales, and that he made conflicting statements about where the pellet gun came from. The jury discredited Karl's testimony and deadlocked on the robbery counts against Jones (counts 1-4). . . . [¶] The trial court did not err in concluding that the new evidence was cumulative impeachment evidence and not material to the conspiracy conviction.

Petitioner also complains that Karl testified falsely that he borrowed the pellet gun used in the Downey robbery from a person named Stacy Henderson when he instead received it from Henderson in exchange for crack cocaine.[15] (FAP Mem. at 21; see also RT 4827, 4848-49). But among other deficiencies, Petitioner has not shown the prosecutor knew, or should have known, that Karl testified falsely about how he obtained the pellet gun. Gonzalez, 667 F.3d at 994; Pelisamen, 641 F.3d at 408; Hayes, 632 F.3d at 521; Morales, 388 F.3d at 1179; Murtishaw, 255 F.3d at 959. Nor has Petitioner shown materiality.[16] Renzi, 769 F.3d at

(Lodgment 1 at 18-19 (footnote omitted)); see also Gentry v. Sinclair, 705 F.3d 884, 904 (9th Cir. 2013) ("[E]ven if Gentry had an opportunity to impeach Hicks as to his false testimony regarding the denial of any benefit for testifying, that opportunity would have been cumulative of other impeachment evidence and thus immaterial."); Heishman v. Ayers, 621 F.3d 1030, 1035 (9th Cir. 2010) (per curiam) ("A witness may be 'so thoroughly impeached' that even evidence of perjury at trial is 'merely cumulative.'" (quoting United States v. Polizzi, 801 F.2d 1543, 1551 (9th Cir. 1986))). However, since Petitioner has not established the other requirements necessary for a viable false evidence claim, the Court will not further consider the materiality of Karl's inaccurate identification.

[15] This allegation is based on a post-trial investigative report from the District Attorney's office. (See CT 3339-47). The trial court sealed this investigative report (CT 3343-47; RT 16207-09), but in describing the contents of the report, the prosecutor stated, inter alia, that Karl "admits that he received the [pellet] gun from Ms. Henderson in exchange for crack cocaine." (RT 16213).

[16] Since Petitioner barely discusses the pellet gun evidence, the Court will not belabor this point. Suffice it to say that the pellet gun relates to a robbery that did not involve Petitioner, and there is no dispute that Karl's credibility was "thoroughly impeached at trial[,]" (Lodgment 1 at 18-19), including with evidence relating to drug sales. For instance, Bryon Darling testified that he had known Karl for about three years and, during that time, Karl had sold him drugs. (RT 8122-23). Additionally, an Investigator for the San Luis Obispo County District Attorney's Office testified that Karl admitted selling drugs during 2007, the year preceding the trial. (RT 7931, 8122-23). Therefore, even if the jury had heard evidence that

752; <u>United States v. Rodriguez</u>, 766 F.3d 970, 989 (9th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 1013 (2015); <u>Heishman v. Ayers</u>, 621 F.3d 1030, 1035 (9th Cir. 2010) (<u>per curiam</u>).

Accordingly, the state court's rejection of Ground Two was not contrary to, or an unreasonable application of, clearly established federal law.

### b.   Failure to Disclose Evidence

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" <u>Wearry v. Cain</u>, 136 S. Ct. 1002, 1006 (2016) (<u>per curiam</u>) (quoting <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)). There are "three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).

---

Henderson had traded the pellet gun to Karl for drugs, rather than simply borrowing the gun from Henderson as Karl testified, there is no reasonable likelihood that such evidence would have affected the jury's judgment. <u>Agurs</u>, 427 U.S. at 103; <u>Reis-Campos v. Biter</u>, 832 F.3d 968, 977-78 (9th Cir. 2016), <u>cert. denied</u>, 137 S. Ct. 1447 (2017); <u>Renzi</u>, 769 F.3d at 752; <u>United States v. Rodriguez</u>, 766 F.3d 970, 989 (9th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 1013 (2015); <u>Heishman</u>, 621 F.3d at 1035.

Petitioner complains that the prosecution failed to disclose favorable evidence impeaching prosecution witness Paul Goins's credibility. (FAP at 6; FAP Mem. at 24-27). In particular, Petitioner alleges that while in jail, Goins made phone calls to family members in which he made statements contradicting his testimony and an underlying plea agreement he had entered into,[17] and Petitioner complains the prosecutor violated his <u>Brady</u> obligations by failing to turn over recordings of those conversations. (FAP Mem. at 25).

To comply with <u>Brady</u>, the government "'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" <u>Strickler</u>, 527 U.S. at 281 (quoting <u>Kyles. v. Whitley</u>, 514 U.S. 419, 437 (1999)); <u>see also</u> <u>Wearry</u>, 136 S. Ct. at 1007 n.8 ("'*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.'" (2016) (<u>per</u> <u>curiam</u>) (citations omitted)). Here, however, Petitioner has not shown that any recordings existed,[18] and his mere speculation about such a possibility

---

[17]   Goins pled guilty to attempted robbery and was awaiting sentencing when he testified. (RT 5458-59).

[18]   The California Court of Appeal found that "[t]he record is silent on whether phone audiotapes were made or ever existed[,]" (Lodgment 1 at 21), and Petitioner has not rebutted this finding. <u>Hedlund</u>, 854 F.3d at 563. Indeed, Petitioner has not provided any evidence that phone calls Goins might have made or received while in jail were recorded. Instead, Petitioner bases his claim on a statement made at trial by a co-defendant's trial counsel, who indicated he "believe[d]" that Goins may have made calls to family members "that may contain conflicting statements" and that might have been recorded. (RT 7078). This is plainly insufficient to support a viable <u>Brady</u> claim.

In his Objections, Petitioner cites a declaration from his and

34

is manifestly insufficient to state a viable <u>Brady</u> claim.  <u>See</u> <u>Wood v.</u> <u>Bartholomew</u>, 516 U.S. 1, 8 (1995) (<u>per</u> <u>curiam</u>) (granting a habeas corpus petition "on the basis of little more than speculation" is improper); <u>Runningeagle v. Ryan</u>, 686 F.3d 758, 769 (9th Cir. 2012) ("[T]o state a *Brady* claim, [a petitioner] is required to do more than 'merely speculate' [about possible evidence]."); <u>Downs v. Hoyt</u>, 232 F.3d 1031, 1037 (9th Cir. 2000) (petitioner's speculative arguments are insufficient to satisfy <u>Brady</u>); <u>Cooks v. Spalding</u>, 660 F.2d 738, 740 (9th Cir. 1981) (<u>per</u> <u>curiam</u>) (claim that "amounts to mere speculation" does not warrant habeas corpus relief).

Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

C.  **Court Security/Improper Shackling**

In Ground Four, Petitioner alleges he was denied due process of law and a fair trial because "[t]he eight uniformed officers and two armed deputies in the courtroom depicted [P]etitioner as an untrustworthy, dangerous criminal[.]"  (FAP at 6; FAP Mem. at 27-35).  In Ground Five, Petitioner claims the "unjustified initial stun belt orders and restraint with shackles" denied him due process of law and a fair trial.  (FAP at 6; FAP Mem. at 35-39).

---

Goins's mother, Janice Lovely (<u>See</u> Objections at 16 n.2; Dkt. No. 46, Exh. D), but among other issues, the declaration does nothing to demonstrate that any phone calls she had with Goins while he was in jail were recorded.

## 1. Background

The California Court of Appeal set forth the following facts underlying this claim:

> During the preliminary hearing, [Petitioner] and Lovely disrupted the proceedings and tried to intimidate Goins. [Petitioner] told Goins to "stop lying. . . ." The trial court threatened to exclude [Petitioner] and Lovely.

> On April 3, 2008, the trial court conducted a hearing to determine what additional security measures should be implemented. Court Security Supervisor Sergeant James Taylor recommended 12 additional officers if shackles were not used to restrain [Petitioner and his co-defendants]. Sergeant Taylor opined that more security was required because [Petitioner and his co-defendants] were gang members and had demonstrated rancor toward their attorneys, some [of the defendants] were facing life sentences, [Petitioner and his co-defendants] had disrupted proceedings and were seated close to the audience, and a confidential informant and former accomplice were scheduled to testify. Sergeant Taylor described how Goins was threatened at the preliminary hearing and how a defendant pounded his fist and said "I'm sick of these motherfucking crackers." During the commotion, a second defendant wearing leg chains and handcuffs stood up and had to be restrained by several officers. Sergeant Taylor was concerned that

36

[Petitioner and his co-defendants] could create another distraction and escape or take a hostage.

The trial court found that Mitchell and [Petitioner] were physically threatening and verbally hostile to Goins at the preliminary hearing. It was a safety concern because Mitchell had a "short fuse" and was "aggressive in court" in dealing with counsel. The trial court determined that eight additional officers were required and ordered Mitchell and [Petitioner] to wear electronic react belts. Counsel for [Petitioner] objected to the use of a react belt but acknowledged that everyone "can genuinely feel the tension in the air. . . ."

Upon reconsideration, the trial court rescinded the react belt order and ordered Mitchell and [Petitioner] to wear leg shackles under their clothing. Counsel acknowledged that the shackles could not be seen or heard by the jurors.

Although no one was required to wear a react belt, there were more outbursts and disruptions. On April 24, 2008, Mitchell interrupted a police officer's testimony and yelled, "Stop lying, man. Stop lying."

The trial court denied a defense request to photograph the courtroom because the security required for a safe trial "changes dramatically when we have 12 jurors and four alternates. We have the public present and we have staff

present as [w]ell. . . . I don't want photographs taken of the jury or court staff or members of the public."

Rather than photograph the courtroom, the trial court described the layout of the courtroom including the courtroom dimensions (60 by 40 feet), where the jury and audience were seated, the seating arrangements for counsel and [Petitioner and his co-defendants] (two rows of tables in a 30 by 30 foot court well), and where the bailiff and eight unarmed officers were seated. The court noted that two armed deputies were in the audience monitoring access to the courtroom.

Before the trial concluded, there were more outbursts. [Petitioner] interrupted an officer's testimony on May 13, 2008. On another day, [Petitioner and his co-defendants] distracted the jurors and were admonished. When the verdicts were read on June 4, 2008, a woman in the audience yelled, "There is no justice in the fucking court system." She was removed from the courtroom.

(Lodgment 1 at 21-23; see also CT 351-52, 1714-20; RT 334-36, 650-82, 905-11, 1258-62, 1504, 2406-08, 3676-77, 5152, 6304-09, 11157).

**2. California Court of Appeal's Opinion**

The California Court of Appeal rejected Petitioner's claim, stating:

38

[Petitioner] complains that the courtroom security was excessive but makes no showing that the security measures denied him a fair trial.

*     *     *

The presence of additional officers is permitted where reasonable and necessary to maintain courtroom security. Here the logistics of trying six gang members in the same courtroom presented substantial security problems that were magnified by [Petitioner and his co-defendants'] disruptive conduct and outbursts. Mitchell's attorney was concerned about the "friction and tension between me and my client" and warned the court that "this thing is about to spin out of control in a bad way. It's going to I think impact the trial, impact the length of trial, and impact a lot of things as far as who is in control."

[Petitioner and his co-defendants] make no showing that the security measures were excessive or that the facts, as articulated by the trial court, did not establish a manifest need for additional security. The error, if any, in ordering [Petitioner] and Mitchell to wear shackles and ordering the use of additional officers was harmless under any standard of review. Our Supreme Court has "consistently held that courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." [Petitioner and his co-defendants] have "not cited, nor, after a nationwide search,

39

have we found, a single conviction that has been reversed under [<u>Holbrook v. Flynn</u>, 475 U.S. 560 (1986)] based on the presence of excessive security in the courtroom."

(Lodgment 1 at 21, 23-24 (citations omitted)).

### 3. **Analysis**

### a. Courtroom Security

In federal habeas corpus proceedings, federal courts reviewing the constitutionality of security personnel used at trial must "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to [Petitioner's] right to a fair trial[.]" <u>Flynn</u>, 475 U.S. at 572; <u>Williams v. Woodford</u>, 384 F.3d 567, 588 (9th Cir. 2004); <u>see also</u> <u>Hayes</u>, 632 F.3d at 521 (<u>Flynn</u> "establishes the framework for analyzing whether courtroom security measures violate a defendant's right to a fair trial."). "In assessing inherent prejudice, the question is 'whether an unacceptable risk is presented of impermissible factors coming into play' in the jury's evaluation of the defendant." <u>Hayes</u>, 632 F.3d at 521 (quoting <u>Flynn</u>, 475 U.S. at 570). "If security measures are not found to be inherently prejudicial, a court then considers whether the measures actually prejudiced members of the jury." <u>Hayes</u>, 632 F.3d at 521-22; <u>Flynn</u>, 475 U.S. at 572. "[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." <u>Flynn</u>, 475 U.S. at 572; <u>Hayes</u>, 632 F.3d at 522.

40

Petitioner "has made no showing of actual prejudice." Morgan v. Aispuro, 946 F.2d 1462, 1464 (9th Cir. 1991); see also Hayes, 632 F.3d at 522 ("Hayes has not shown that he was actually prejudiced by the security measures" since he provided "no evidence [showing] . . . jurors were actually influenced by the measures he complains of."); Williams, 384 F.3d at 588 (conclusory allegations insufficient to demonstrate actual prejudice). Accordingly, the Court must determine whether the presence of extra security personnel was inherently prejudicial.

Here, courtroom security personnel for the six defendants consisted of two armed Sheriff's deputies monitoring access to the courtroom and eight unarmed, uniformed correctional officers: three seated behind the defendants; one seated on each side of the defendants; two seated in the audience; and the court's bailiff who was behind the court's clerk. (RT 6308-09). Petitioner has not shown there was anything inherently prejudicial about this arrangement. To the contrary, in Flynn, the Supreme Court held that the presence of uniformed security officers sitting behind the defendants at trial was not inherently prejudicial, stating:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a

41

defendant's trial need not be interpreted as a sign that he is
particularly dangerous or culpable. Jurors may just as easily
believe that the officers are there to guard against
disruptions emanating from outside the courtroom or to ensure
that tense courtroom exchanges do not erupt into violence.
Indeed, it is entirely possible that jurors will not infer
anything at all from the presence of the guards. If they are
placed at some distance from the accused, security officers may
well be perceived more as elements of an impressive drama than
as reminders of the defendant's special status. Our society
has become inured to the presence of armed guards in most
public places; they are doubtless taken for granted so long as
their numbers or weaponry do not suggest particular official
concern or alarm.

Flynn, 475 U.S. at 569.[19]  Flynn "directly establishes that the
placement of deputies . . . at [Petitioner's] trial was not inherently
prejudicial." Hayes, 632 F.3d at 522; Flynn, 475 U.S. at 568-69; see
also Williams, 384 F.3d at 587-88 (placement of four marshals in
courtroom for one defendant "does not create an unacceptable risk
jurors impermissibly inferred defendants's guilt"); Ainsworth v.
Calderon, 138 F.3d 787, 797 (9th Cir. 1998) (there was "nothing
inherently prejudicial" in security arrangements for two defendants
when "[t]here were generally four, and occasionally six, armed

---

[19]  In Flynn, "[t]he courtroom security force . . . consisted of
four uniformed state troopers, two Deputy Sheriffs, and six Committing
Squad officers" for six defendants. Flynn, 475 U.S. at 570. However,
the issue before the Supreme Court was only whether the presence of the
four uniformed state troopers denied Flynn a fair trial. Id.

sheriff's deputies present at trial"), amended by, 152 F.3d 1223 (9th Cir. 1998); King v. Rowland, 977 F.2d 1354, 1358 (9th Cir. 1992) (use of three deputy sheriffs to guard King not inherently prejudicial).

Therefore, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

    b.   Stun Belt/Shackles

"[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005); Wharton v. Chappel, 765 F.3d 953, 964 (9th Cir. 2014). "To demonstrate that his shackling at trial amounted to a constitutional violation, Petitioner must demonstrate: (1) that he was 'physically restrained in the presence of the jury,' (2) that 'the shackling was seen by the jury,' (3) that the 'physical restraint was not justified by state interests,' and (4) that 'he suffered prejudice as a result.'" Cox v. Ayers, 613 F.3d 883, 890 (9th Cir. 2010) (citation omitted); Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002). To establish prejudice, Petitioner must show the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); Hedlund, 854 F.3d at 568 n.7. Petitioner cannot meet these standards.

43

Although the trial court initially ordered Petitioner to wear a stun belt, the trial court subsequently rescinded that order and Petitioner was never required to wear a stun belt. (RT 908-11, 2406-07). Accordingly, Petitioner simply cannot show a due process violation from the unimplemented stun belt order.[20] Cox, 613 F.3d at 890; Ghent, 279 F.3d at 1132; see also Dows v. Wood, 211 F.3d 480, 486-87 (9th Cir. 2000) (factually unfounded argument provides no basis for federal habeas relief).

The trial court required Petitioner to wear leg shackles throughout the trial wrapped with material "so that there wouldn't be any sound." (RT 2407-08). The California Court of Appeal found that Petitioner's defense counsel "acknowledged that the shackles could not be seen or heard by the jurors[,]"[21] and denied Petitioner's claim concluding, there was "no showing that the security measures were excessive" and any possible error in ordering Petitioner to wear shackles "was harmless under any standard of review." (Lodgment 1 at 22-23); see also United States v. Cazares, 788 F.3d 956, 966 (9th Cir. 2015) ("Visibility of the shackles is critical to the determination of

_____

[20] Respondent attempts to split Ground Five into separate claims involving the stun belt and shackles, and he contends that the stun belt portion of Ground Five is Teague-barred. (See Ans. Mem. at 44-45). The Court disagrees. See Gonzalez v. Pliler, 341 F.3d 897, 904-05 (9th Cir. 2003).

[21] Petitioner has not rebutted this finding. (See RT 2407-08, 3677; Hedlund, 854 F.3d at 563; see also United States v. Mejia, 559 F.3d 1113, 1117-18 (9th Cir. 2009) ("[W]e accept as fact the district court's finding that the jury could not see Mejia's shackles."). While Petitioner "disputes that the shackles were not visible to, or at least, circumstantially inferable to the jury[,]" (FAP Mem. at 38), he identifies no evidence reasonably supporting his argument.

44

the due process issue."), cert. denied, 136 S. Ct. 2484 (2016). Where, as here, "care is taken to ensure that a defendant's shackling is not visible to the jury in the courtroom, no error results."[22] Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999); Cox, 613 F.3d at 890; Ghent, 279 F.3d at 1132; see also Cazares, 788 F.3d at 966 ("The shackles were not visible and the defendants' due process rights were not violated by the shackling."); Williams, 384 F.3d at 592 ("When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial."); United States v. Collins, 109 F.3d 1413, 1418 (9th Cir. 1997) ("Collins has failed to demonstrate that his right to due process was prejudiced because there is no evidence the jury was aware that he was shackled or restrained.").

Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of clearly established federal law.[23]

---

[22] In any event, Petitioner has not shown that any possible error in requiring Petitioner to wear leg shackles had a substantial and injurious effect or influence on the jury's verdict. Brecht, 507 U.S. at 623; Hedlund, 854 F.3d at 568 n.7.

[23] Petitioner alternately seeks an evidentiary hearing on the prejudicial effect of the shackles. (FAP Mem. at 38-39; Reply Mem. at 15-16). Petitioner's request is denied since review of claims under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 563 U.S. at 181; see also Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) (An "evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief."); Gulbrandson v. Ryan, 738 F.3d 976, 994 (9th Cir. 2013) ("[T]he state court's rejections of [the petitioner's] claims were neither contrary to, nor involved unreasonable applications, of [clearly established federal law]. Thus, *Pinholster* bars a habeas court from any further factual

## D. **Cumulative Error**

"The cumulative error doctrine in habeas recognizes that, even if no single error were prejudicial, where there are several substantial errors, their cumulative effect may nevertheless be so prejudicial as to require reversal." Parle v. Runnels, 387 F.3d 1030, 1045 (9th Cir. 2004) (internal quotation marks omitted); Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011). Habeas relief for cumulative error is appropriate "when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." Ybarra, 656 F.3d at 1001 (quoting Parle, 505 F.3d at 933).

In Ground Eight, Petitioner contends the cumulative effect of the alleged errors in Grounds One through Five requires reversal. (FAP Mem. at 46). The California Court of Appeal rejected Ground Eight because "none of the purported errors, either singularly or cumulatively, denied [Petitioner] a fair trial." (Lodgment 1 at 27).

Here, "because [the Court] hold[s] that none of [Petitioner's] claims rise to the level of constitutional error, 'there is nothing to accumulate to a level of a constitutional violation.'" Fairbank v. Ayers, 650 F.3d 1243, 1257 (9th Cir. 2011) (citation omitted); see also Hayes, 632 F.3d at 524 ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). Therefore, the California court's rejection of Ground

development on these claims.").

46

Eight was not contrary to, or an unreasonable application of, clearly established federal law.

## VII.

### RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order: (1) accepting this Final Report and Recommendation, (2) denying the First Amended Petition for Writ of Habeas Corpus, and (3) directing that Judgment be entered dismissing this action with prejudice.

DATED: November 6, 2017

_____
/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

### NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number. No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.

47